**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00216-CV**

_____

**IN THE INTEREST OF B.A.**

**On Appeal from the County Court at Law**
**Polk County, Texas**
**Trial Cause No. CIV32763**

**MEMORANDUM OPINION**

After a bench trial, Appellant M.A. ("Mitch")[1] appeals the trial court's order

terminating his parental rights to his minor child B.A. ("Becky"), an eleven-year-old

child. The trial court also terminated the parental rights of the mother L.J. ("Lena").[2]

We affirm the trial court's judgment.

---

[1] To protect the identity of the minor, we use pseudonyms to refer to the child and her parents. *See* Tex. R. App. P. 9.8(b)(2).

[2] Lena is not a party to this appeal, and we include limited details about her only as necessary to explain the facts.

## Background

On May 3, 2019, the Department of Family and Protective Services ("Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The petition named nine-year-old Becky as the subject of the suit, Lena as the child's mother, and Mitch as the child's father.

The petition was supported by an affidavit by a Child Protective Services (CPS) worker and representative of the Department and stated that, on May 2, 2019, an Onalaska Police Officer called a Department caseworker to Lena's home. Lena asked the caseworker to take Becky and said Becky's father was coming and Lena did not want the child anymore. Becky was screaming, hitting her mother, and fighting with law enforcement. Law enforcement used force to control Becky and placed her in a patrol car. Because Becky was only nine years old, the caseworker asked the police to take Becky to the Department office. Lena signed a form relinquishing her rights and requesting that CPS take the child. The caseworker contacted Becky's father Mitch, who said he had not seen Becky for at least a year, and he lived an hour and a half away, but he agreed to pick her up. According to the CPS report the Father did not arrive to pick her up.

The caseworker determined that there was a prior investigation of Lena, who was not supposed to have unsupervised contact with Becky and who had not

complied with the requests made by the Department. There was an ongoing domestic violence investigation of Lena's boyfriend Walter, and the Department had previously received complaints about visible marks and bruises on Becky, who told the Department that Walter had dragged her on the street and hit her with a belt. Walter admitted he hit Becky with a belt. The affidavit reported three previous reports of neglectful supervision of Becky by Lena, including allegations of physical violence and drug use by Lena.

The Department was named temporary sole managing conservator of the child. The trial court ordered the parents to provide the Department with their contact information, names and contact information for relatives that might be suitable placements, evidence of financial ability to care for the child, evidence of health insurance for the child, and the child's medical history. Family service plans for Lena and Mitch were filed on September 12, 2019, and on November 14, 2019, a signed family service plan for Mitch was refiled. Mitch's family service plan noted that he has PTSD, anxiety, ADHD, and bipolar disorder. While Mitch was incarcerated at TDCJ, he was on medication, but he has not been on medication since he was released from TDCJ. Mitch was incarcerated for two years for assault of a family member (Lena's sister).

After a permanency hearing, on November 12, 2019, the trial court entered an order requiring supervised visitations by Lena and Mitch. The order also required

the parents comply with their respective family service plans. Becky was then placed in a foster home, and she was receiving psychotropic medication and psychosocial and behavioral therapies.

A permanency report filed in November 2019 stated that Becky had been diagnosed with bipolar disorder, ADHD, and oppositional defiant disorder in a June 2019 assessment. The report also stated that Becky had made homicidal threats against the foster parents and was receiving in-patient care. The report stated that Mitch was assigned a courtesy worker[3] on August 30, 2019. According to the Department, Mitch refused to get help for his mental health issues, and he was not working his family service plan.

At a hearing on a motion for continuance or extension that Mitch's attorney made just prior to trial, the court asked Mitch why he did not do anything in the ten months between the initial conference and the time the COVID pandemic started, and Mitch replied that he was busy trying to take care of issues in his own court proceeding trying to obtain reinstatement of his Supplemental Security Income (SSI) benefits. The trial court denied the motion for continuance.

---

[3] A courtesy worker serves as a liaison between the primary caseworker and the parent when the parent lives outside of the CPS region where the child is located.

Evidence at Trial

Mitch's Testimony

Mitch testified that the last time he lived in a home with Becky was in 2016 before he was incarcerated for two years for family violence and aggravated assault with a deadly weapon. The family violence was against Lena's sister Casey, who accused him of choking her, hitting her, and throwing her against a wall.

After he got out of prison, Casey contacted Mitch through Facebook to set up video contact between Becky and Mitch for Father's Day in 2018 because Becky wanted to contact him. In November 2019, Becky asked to meet with Mitch for his birthday, and he met her for about two hours in Spring, where Becky was in a foster placement. Mitch testified that he had video-chatted with Becky six times, and Becky said she wanted to live with him but later said she wanted to stay with her grandmother. The last time he spoke with Becky, she told him "she didn't want to have contact with [him] because she felt like [he] was the one that was abusing her." He agreed that he was not able to get to Becky because no one was helping him get in contact with her.

Mitch testified that he had been reevaluated for SSI, he does not have a disability due to "bipolar or anything else[,]" and there is nothing limiting him from going back to work except that the court in his disability case needed to lift an order. He previously could not work due to his disability—bipolar disorder and ADHD.

According to Mitch, he took Depakote while in prison, but he was no longer taking medication for bipolar disorder.

Mitch testified that his first courtesy worker contacted him about thirty days of the initial family conference and visited him at his previous home. Mitch did not recall that the first courtesy worker told him about the services he needed to complete, and he testified that the second courtesy worker, Mahogany Jones, did not contact him until July or August of 2020. Mitch agreed he had provided his contact information to Jones and his caseworker, Keflyn Wilridge, and he stated neither had come to his home. Later, he testified that the first courtesy worker had visited him at his home. Mitch testified that Wilridge called him to ask where Becky was placed and whether Mitch had received the materials he sent, but Mitch said he never received them. Mitch stated that he talked to Jones once briefly, she told him she was waiting on information from Wilridge, and he never met Jones in person. Mitch recalled meeting with Wilridge twice and talking with him by phone several times, and he tried to contact Wilridge by phone or text several times. Mitch also testified that he got a new phone, but his number did not change, and some of his contacts did not get moved to the new phone. According to Mitch, he told Wilridge he was having trouble contacting Jones.

Mitch admitted that he had a service plan and he recalled learning about his service plan in May 2019. He understood what his service plan required—that he

needed to find stable employment, develop a stable living environment, and get a psychological assessment, however he said he had trouble understanding the timeline within which his plan must be completed. He agreed that he tried to do what CPS required but that he had not "tried it fast enough[.]" He also testified that he did not understand how important it was for him to work his service plan because he was not the parent at fault. Mitch testified that prior to his incarceration, he was on SSI because of his ADHD and bipolar disorder, and since his release, he was unable to find employment due to his disability and his felony conviction. According to Mitch, it was not clear what parenting class was required by his service plan. Mitch understood that his service plan required a psychological evaluation, but he could not get that done until he had resolved his SSI situation. Mitch testified that he had scheduled a parenting class and a psychological evaluation, but he had not completed them.[4]

Mitch understood Becky has bipolar disorder and ADHD, she fights a lot, and sometimes has outbursts. He had not participated in Becky's treatment due to restrictions where Becky was placed. Mitch did not believe that Becky would be safe living with her mother or with her maternal grandmother in Hockley because Becky was raped there. Mitch testified that both Lena and her mother Carmela had drug

---

[4] In a hearing on a motion for continuance just prior to trial, Mitch told the court the online parenting class and the psychological evaluation were scheduled for late September 2020.

7

problems. Mitch agreed he would be willing to let CPS continue to have conservatorship of Becky, but he still wanted to be a part of Becky's life.

At the time of trial, Mitch was living in Rosenberg in his girlfriend's two-story, three-bedroom townhouse where he contributes to the rent and where he had lived for about nine months. Mitch testified that he lives in the three-bedroom townhouse with his girlfriend, her two older daughters who are both pregnant, and his girlfriend's adult cousin, who has Down syndrome. Mitch testified that if Becky were to come live with him, she would live with them, but she would have her own room. Mitch testified that he believed that in the future, if Becky gets better and he completed his services, that he could provide a stable home for Becky.

Testimony of Mahogany Jones

Mahogany Jones, a caseworker with the Department in Fort Bend County, testified that she was assigned as the second courtesy caseworker for Mitch on January 9, 2020, and the first courtesy worker was Catalina Cantu. According to Jones, she attempted to contact Mitch every month since January, she sent letters, she left voicemails, but he did not return calls. She first spoke with Mitch by phone on July 27 after she received a new phone number for him. When she told Mitch about having trouble contacting him, Mitch told her he had moved, and he did not explain why he had a new phone number.

According to Jones, Mitch did not tell her he was having problems working with CPS or contacting his Polk County caseworker. Jones recalled that in July, she told Wilridge that she had not been able to get an answer from Mitch since January, and then Wilridge gave Jones a new phone number for Mitch, and she contacted Mitch the same day she received the new number. Jones agreed that the first phone number she had for Mitch was the wrong number, but she also testified that she sent letters and visited his apartment to try to contact him. Jones stated, "it is the parents' responsibility, as well, to remain in contact with the Department." The last time Jones attempted to contact Mitch was August 31, and he did not return her call. Although Mitch's phone also showed that he had received a phone call from Jones in April, Jones did not remember having made that call. Jones agreed that the caseworker is responsible for contact between the Department and the parent, and a parent is expected to contact their caseworker monthly. Jones also testified that she told Mitch he needed to contact his caseworker—either herself or Wilridge—every month.

According to Jones, Mitch's service plan required him to take a parenting class, get psychological and psychiatric evaluations, maintain a stable home environment, make visits with his daughter, and keep in contact with the Department. Jones testified that Mitch did not complete the parenting class or psychological and psychiatric evaluations. Jones agreed she would have provided

9

information to Mitch or set up his psychological and psychiatric evaluation, but she did not because he did not call her back and she was unable to talk to him until July. Jones believed that Mitch understood the case plan and what he needed to do, but he talked to her about SSI, which was not part of his service plan. Jones testified that Mitch denied having mental health issues, and "there was pushback" on each service she asked him to complete. When Jones attempted to speak with Mitch about his service plan, he told her what the Department needed to do, where Becky should be placed, and what the prior caseworker was doing or not doing. Jones denied that she told Mitch she would get him a copy of his service plan. Jones testified that, as a courtesy worker, she did not know where Becky was placed. Jones informed Mitch that he would have to seek out a parenting class because CPS would not pay for his class. Jones testified that Mitch did not give her any reason why he had not completed his service plan. Jones also testified that she informed Mitch that if he did not complete his service plan, his parental rights could be terminated.

The records Jones read indicated that the previous courtesy worker, Cantu, had made required monthly face-to-face visits with Mitch at least three times, she visited Mitch at his apartment, and she set up drug tests for Mitch. Mitch also told Jones that he had spoken with Cantu.

Testimony of Keflyn Wilridge

Keflyn Wilridge testified that he was assigned by the Department as caseworker in this case on May 17, 2019. When the Department was first contacted about this case, visible marks and bruises were observed on Becky, and Becky told Department staff that her stepfather had dragged her on the street and hit her with a belt. Wilridge testified that it has been difficult to find placements for Becky because she is very aggressive toward staff and her peers. When asked why Becky was not initially placed with Mitch, Wilridge replied that the Department had concerns that Mitch had been out of Becky's life and in prison for two years, he had injured a child, he had a history of aggravated assault with a deadly weapon, and he had unaddressed mental health issues.

According to Wilridge, Becky never really talks about her father and has said "I don't love my father." But Becky speaks highly of her grandmother, who is living in an RV, and she wants to be placed with her. Wilridge testified that the grandmother will need to attend counseling and learn how to deal with Becky's behavior issues, but she has said she is willing to do so, and the Department has not determined whether the grandmother is an appropriate placement.

Wilridge agreed he was present when the family service plans were presented to the parents, along with his supervisor Cedric Vinson, Mitch's attorney, Mitch, and Lena. According to Wilridge, when he contacted Mitch in July 2019, Mitch told him

11

he did not have stable living and he "bounc[ed]" between staying with his girlfriend and with his family, and once he was at a single address, a courtesy worker was assigned to the case. Mitch gave Wilridge three addresses during the pendency of the case, and Wilridge was not aware of Mitch maintaining stable housing. Wilridge testified that, because Mitch lived outside the region where the case began, a courtesy worker was assigned to go over his services with him and make sure he understood the service plan and that he must cooperate to get his child back. Wilridge recalled contacting Mitch at least once a month by phone or text and notified him when Becky moved to a different placement. Wilridge agreed that one time Mitch had told him he was not able to contact his courtesy worker, Ms. Jones, and that Wilridge then let the courtesy worker know that Mitch tried to contact the courtesy worker. According to Wilridge, at one point Mitch's phone was disconnected and he could not contact Mitch, and once when he contacted Mitch, Mitch told him he was in Arizona for a few weeks. Wilridge did not get Mitch's new address until July 2020.

Wilridge testified that Mitch's service plan required him to have stable housing, financial stability, have skills for coping with his PTSD, ADHD, and bipolar disorder, get counseling, and take a psychological evaluation and mental health screen and release the results to the Department. Wilridge agreed that Mitch asked for a copy of the service plan and Wilridge sent one to the address Mitch

provided, and when Mitch said he did not receive it, Wilridge sent another copy. Wilridge further testified that it was Mitch's responsibility to work with his courtesy worker to get the service plan items set up, and he advised Mitch that he did not have that much time to complete his service plan. According to Wilridge, Mitch understood what the service plan required but he did not make any attempts to work his service plan, even though he had eighteen months to complete it. Wilridge testified that he did not believe Mitch was taking prescription medicine for his mental health issues although he was taking Depakote at the time of the initial family conference and Mitch had told the courtesy worker that he was not going to address his mental health issues. Wilridge also testified that Mitch did not obtain stable housing, he had not been able to verify Mitch's address, or living arrangements. According to Wilridge, Mitch told him he was working on his SSI issues, but Wilridge never received any documentation. Wilridge testified that the Department never received any reports that Mitch had completed psychological and mental health evaluations.

According to Wilridge, the affidavit supporting removal stated that due to Becky's behavior, Lena could no longer handle her and did not want anything to do with the child. Wilridge testified that he had contact with Lena at least once a month. Wilridge did not believe that Lena did anything to complete her service plan.

13

Wilridge testified that the Department believed that termination of both parents' parental rights and for the Department to be permanent managing conservator was in Becky's best interest. At the time of trial, the Department's long-term goal for Becky was placement with her maternal grandmother.

Testimony of Cedric Vinson

Cedric Vinson testified that he was the conservatorship supervisor in this case. He was present when the service plan was presented to Mitch.[5] According to Vinson, the Department changed the goal from reunification to adoption five months into the case, which the Department generally does when the parents are not making progress on their service plans. Vinson testified that it is the parents' responsibility to work their services, and parents must start and complete services to be in compliance. According to Vinson, the Department's role is to request parents to complete their service plan and to refer parents to service providers. Vinson recalled that Jones, Mitch's courtesy worker, contacted Wilridge, the caseworker, when she was unable to contact Mitch and Wilridge gave her Mitch's phone number.

---

[5] A copy of Mitch's service plan was filed in the clerk's record on September 12, 2019, and it was signed by the Department but not by Mitch and it indicates therein that Mitch did not sign it at that time because his trial attorney wanted to review it with him before he signed it, and the "FPOS will be presented to the court and the father during the status hearing." Later, on November 14, 2019, another copy of the service plan was presented to the trial court and filed in the record, and that copy contains a signature for Mitch dated November 2, 2019.

Vinson testified that, at the time of trial, Becky was placed in a residential treatment center because her behavioral issues became severe. Vinson testified that the Department did a home study on Becky's maternal grandmother but placing Becky with her grandmother was deferred due to Becky's severe behavioral issues. The Department believed that the grandmother needed to prepare for Becky's behavioral issues by participating in treatment plans and counseling. Vinson testified that the Department was asking for permanent managing conservatorship because the mother had not worked her services and had mentioned she was willing to relinquish her right, and:

> . . . [Mitch] did not work services during the initial one year he was given. He was then given additional time due to the COVID extension. The father did not make any efforts to work services to have [Becky] placed with him during this time.
>
> Mitch has been provided opportunity to participate in phone calls and virtual visits during COVID, when in-person visits [were] not available. Transportation was not an issue. However, he still did not take advantage of these opportunities to work on his relationship with [Becky].
>
> And the ground for termination of his parental rights, if he did not participate in services[,] was included in the Department's original petition. . . .
>
> . . . I do not think that it is fair to [Becky] to have her future put on hold or left up in the air any longer because [Mitch] hasn't -- has chose[n] not to take this matter seriously and do whatever was necessary from day one to have her placed with him.

Testimony of the CASA

The Court Appointed Special Advocate (CASA) testified that she was assigned to this case in October 2019, she spoke with Mitch at the first court date

15

she attended, and she met Lena once in Huntsville. The CASA also met with Becky four times, and she talks with Becky at least once a month. According to the CASA, Becky is hard to control, is prone to violence, and likes to run away when she gets upset. Becky has been hospitalized during the case for violent tendencies and outbursts, and she was moved to different placements due to her outbursts. The CASA testified that Becky is going to need a lot of care and therapy to overcome her issues and may never overcome them. The CASA did not believe that either Lena or Mitch was in a position to provide for Becky's needs. In the CASA's opinion, CPS was in the best position to provide the care Becky needs, but Becky's grandmother was in the best position to provide family bonding and with some guidance and assistance, the grandmother was capable of meeting Becky's needs. The CASA testified that she did not think Mitch would be able to provide for Becky because she had been informed that Mitch did not complete his service plan and he is difficult to contact.

Testimony of Mitch's Father

Mitch's father and Becky's grandfather, Mack, testified that Becky lived with Mitch before Mitch went to prison. Mack testified that his family wanted to remain in Becky's life. Mack had not seen extreme behavior issues with Becky but knew she sometimes was "hyper." According to Mack, Mitch has been trying to get his SSI reinstated and he has no way to pay for medical treatment on his own. Mack

16

recalled that Mitch has managed his own mental health issues with medication and therapy, but Mitch does not like the way medication made him feel. Mack agreed that Mitch's ADHD affects his ability to get tasks performed timely.

Testimony of Joanna

Joanna testified that her relationship with Mitch began when he got out of prison. She agreed she bought him a telephone, which had the same number at the time of trial, and it was not the same phone number the courtesy worker testified about at trial. According to Joanna, when Mitch got out of prison, he stayed with his mother and then he stayed with a cousin. Joanna and Mitch moved into an apartment in July 2019, and Joanna agreed she was with Mitch when he gave his new address to CPS. After six months, they moved to a townhouse. Joanna testified that the townhouse has three bedrooms, and her two pregnant daughters are staying with her in addition to a cousin with Down syndrome. According to Joanna, Wilridge never mentioned that the courtesy worker was having trouble contacting her and Mitch. Joanna testified that she and Mitch visited Becky four times when Becky was placed in Beaumont. Joanna had observed Mitch talking with Becky by phone or Facetime, and she has seen Becky hang up on Mitch. According to Joanna, Mitch has three children in addition to Becky. Joanna testified that, if Mitch is unable to get SSI, he wants to ask the judge to lift the ineligibility to work.

17

## Post-Trial Proceedings

At the conclusion of the bench trial, the trial court took judicial notice of Lena's and Mitch's service plans as well as temporary orders in the case. On October 7, 2020, the trial court entered an order terminating Lena's and Mitch's parental rights to Becky. The trial court found that termination of both parents' parental rights was in Becky's best interest, that Lena had constructively abandoned Becky and failed to comply with her service plan, and that Mitch had failed to comply with his service plan.

Mitch filed a motion for new trial, arguing that the evidence was legally and factually insufficient to support the court's judgment. Mitch also filed a request for findings of fact and conclusions of law. After a hearing on the motion for new trial, the court denied the motion. The court also entered findings of fact and conclusions of law, which stated in relevant part:

> 6. A family service plan was prepared for [Lena] and [Mitch] at a family group conference. [Mitch] was present at the conference. [Lena] initially participated by telephone but terminated the call prior to the end of the conference.
> . . .
> 8. [Mitch] signed the family service plan on November 2, 2019.
>
> 9. On November 12, 2019, the court ordered each parent to comply with each requirement set out in the service plan. [Mitch] was present in court with his attorney when this order was rendered. No objection to the order or the plan was lodged.
> . . .
> 14. The service plan required [Mitch] to maintain contact with the caseworker.

18

15. [Mitch] failed to maintain contact with either the primary caseworker in Polk County or the courtesy caseworker assigned in Ft. Bend County as required.

16. The service plan required [Mitch] to maintain stable employment.

17. [Mitch] failed to obtain employment at any time during the case.

18. The service plan required [Mitch] to maintain a stable living environment.

19. [Mitch] failed to provide any verification to the Department concerning his living arra[nge]ment.

20. The service plan required [Mitch] to participate in a psychological evaluation and follow recommendations. He failed to do so.

21. [Mitch] was required to obtain treatment for preexisting post-traumatic stress disorder, bipolar disorder, attention deficient hyperactive disorder and anxiety. [Mitch] refused to take any prescribed medication or obtain treatment for any condition.

22. [Mitch] provided no reason for his failure to comply with the family service plan.

23. Since the time the child was placed in the temporary managing conservatorship of the Department, she has required hospitalization and special placements for violent tendencies and outbursts and requires long term care and stability.

24. Neither parent has shown the ability to care for the child's special needs.

25. [Mitch] has failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of his child who ha[s] been in the temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.
. . .

28. It is in the best interest of the child that the parental rights of [Lena] and [Mitch] to the child be terminated.

29. It is in the best interest of the child[] that the Department of Family and Protective Services be named the Permanent Managing Conservator of the child[].

The Findings of Fact No. 25 through 28 are found by clear and convincing evidence.

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have

20

disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (citing *In re J.L.*, 163 S.W.3d at 86-87). Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). We defer to the trial court's unchallenged findings of fact that

21

are supported by the evidence, and we do not supplant the factfinder's judgment. *See In re H.R.M.*, 209 S.W.3d at 108.

## Compliance with Service Plan

In his first appellate issue, Appellant challenges the legal and factual sufficiency of the trial court's findings under subsection 161.001(b)(1)(O). According to Appellant, he established a defense to this predicate by a preponderance of the evidence as provided for in subsection 161.001(d).

"[T]o terminate parental rights under section 161.001(b)(1)(O): (1) the parent must have failed to comply with the provisions of a court order, which (2) specifically established the actions necessary for the parent to receive custody of the child from the Department, which serves as the permanent or temporary conservator of the child." *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (citing Tex. Fam. Code § 161.001(b)(1)(O)). Also known as a family-service plan, "[a] trial court order referenced by section 161.001(b)(1)(O) is a mandate or directive that establishes some steps or actions necessary for the parent to obtain return of the child who is in the Department's custody." *Id.* at 238. "The burden of complying with the court order is on the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 690 (Tex. App.—San Antonio 2017, pet. denied). "The Family Code does not provide for substantial compliance with a family services plan." *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "Subsection (O) looks only for a

22

parent's failure to comply with a court order, without reference to quantity of failure or degree of compliance." *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.). Thus, a parent may violate subsection (O) even when the parent had "sporadic incidents of partial compliance" with the court order. *In re J.F.C.*, 96 S.W.3d at 278.

In this case, Appellant does not dispute that he failed to comply with the terms of his family-service plan. Instead, he argues that he could not comply due to lapses by the Department and delays in resolving his SSI issues. As support for this contention, Appellant relies on section 161.001(d) of the Texas Family Code, which provides:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> (1) the parent was unable to comply with specific provisions of the court order; and
>
> (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Tex. Fam. Code Ann. § 161.001(d); *see also In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019). Section 161.001(d) places the burden of proof on the parent. *See* Tex. Fam. Code Ann. § 161.001(d).

According to Appellant, he met the requirements under section 161.001(d) because there was a preponderance of evidence that he had made a good faith effort

23

to comply with the service plan and that any failure to comply with the service plan was not his fault. The Department argues that section 161.001(d) is an affirmative defense that must be specifically pleaded under Texas Rule of Civil Procedure 94, and that the defense is unavailable to Mitch because he failed to do so, but even if the defense had been asserted in his pleadings, Mitch failed to meet his burden. *See* Tex. R. Civ. P. 94.

Appellant argues that he spent considerable time trying to get his SSI benefits reestablished, but the caseworker never requested documentation from him. He also contends that he was unable to seek employment until an SSI judge lifted the prior order of disability. Appellant also argues that he completed a psychological assessment for SSI, but he says he could not afford to complete another one for CPS until his SSI issues were resolved. He argues that no courtesy worker was assigned to his case from June 2019 through December 2019 and that the second caseworker assigned to his case was unable to contact him and had not followed up with the first caseworker for six months, which resulted in "effectively a one year gap-delay caused by CPS." Appellant contends that at the time of trial in mid-September 2020, he had an appointment for an assessment scheduled for the end of September. As to the requirement that he participate in a parenting class, Appellant argues that his courtesy worker told him he needed to find and pay for a class himself, and he claims he had scheduled an online class in late September, about ten days after trial.

Courtesy worker Mahogany Jones testified that she was unable to reach Mitch for about six months at the telephone number provided, and when she contacted him after receiving a new phone number for him, he did not explain why he had a new number. Jones also testified that she left voicemails for Mitch and mailed letters to him, but he did not respond. Jones believed that Mitch understood the requirements of his service plan but "there was pushback" when she asked him about completing his services and Mitch told her what the Department needed to do. According to Jones, Mitch denied having mental health issues, and he did not give her any reason why he had not completed his service plan.

Caseworker Keflyn Wilridge testified that Mitch had not made any attempts to work his service plan, despite having eighteen months to do so. Wilridge also testified that Mitch told his service worker he was not going to work on his mental health issues.

Cedric Vinson, the conservatorship supervisor, testified that it is the parent's responsibility to work the required services and a parent must start and complete services to be in compliance with the plan. He also testified that Mitch did not make any efforts to complete his service plan requirements and he did not take advantage of opportunities to work on his relationship with Becky.

After reviewing the record, we conclude that the evidence supports the trial court's findings of fact that Mitch "failed to comply with provisions of a court order

25

that specifically established the actions necessary for him to obtain the return of his child" and that Mitch "provided no reason for his failure to comply with the family service plan." The trial court could have reasonably formed a firm belief or conviction the Department established, by clear and convincing evidence, that Mitch failed to comply with his service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

Appellant's brief argues that he spent "substantial time" working on his SSI issues and had completed a psychological evaluation as part of the SSI application, but the caseworker testified that Mitch never provided any documentation of such efforts. According to Appellant, when his courtesy worker contacted him on July 27, 2020, he was diligent about finding an online parenting class and setting up a psychological evaluation through Harris County MHMR. However, Appellant has not pointed to evidence in the record showing his good faith efforts between the time Mitch signed his family service plan on or about November 2019 and when his second courtesy worker contacted him on July 27, 2020. The courtesy worker testified that Mitch gave "pushback" when she urged him to complete his service plan. The caseworker testified that even though Mitch understood his service plan requirements, he did not make any attempts to work his service plan over eighteen months. The conservatorship supervisor testified that Mitch did not work his service plan for a year, and despite getting an extension due to COVID, he "did not make any efforts to work services" and Mitch did not "take this matter seriously[.]"

Assuming without deciding that Appellant did not waive the section 161.001(d) defense for failure to specifically plead it, we conclude he failed to meet his burden of proof. Deferring to the trial court's role as factfinder and judge of the credibility of the witnesses and weight of testimony, we cannot say that the trial court erred in concluding that Mitch failed to prove by a preponderance of the evidence that he was unable to comply with the trial court's order despite a good faith effort and that the failure to comply with the order was not attributable to Mitch's fault. *See* Tex. Fam. Code Ann. § 161.001(d); *In re Z.M.M.*, 577 S.W.3d at 542; *see also In re L.G.*, 596 S.W.3d 778, 780 (Tex. 2020) (failure to complete an online parenting class, despite having internet access, and failure to communicate with a caseworker, despite having access to a phone, is sufficient evidence of failure to comply with service plan). We conclude that the evidence is legally and factually sufficient to support the trial court's finding under subsection (O), and we overrule Appellant's first issue.

## Best Interest of the Child

In his second issue, Appellant challenges the legal and factual sufficiency of the trial court's determination that termination of his parental rights is in Becky's best interest. Appellant's brief concedes that the Department acting as permanent managing conservator was in Becky's best interest because it "is the entity best suited at this time to continue with [Becky's] treatment and no party had been trained

27

and attended family counseling as recommended prior to placement." However, Appellant argues that there was no evidence that Becky would not benefit from having a relationship with Appellant with placement with Becky's grandmother.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and

nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116. The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.")

(citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Stability and permanence weigh heavily in considering a child's best interest. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

Because stability is important in a child's emotional and physical development, termination of parental interests may be in the child's best interest when a parent is unable to provide a stable environment or a reliable source for food,

clothing, shelter, and emotional support. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.). A parent's refusal to accept a psychiatric diagnosis or to seek treatment for mental health issues may be considered in determining whether the parent-child relationship should be terminated. *See In re E.F.*, 591 S.W.3d 138, 149 (Tex. App.—San Antonio 2019, no pet.) (citing Tex. Fam. Code Ann. § 161.003). A history of domestic violence is also a factor under *Holley* and section 263.307(b)(7). *See In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

Mitch acknowledged at trial that Becky has bipolar disorder and PTSD and that she fights a lot. Becky's aggressive outbursts have required the Department to move her to a new placement about eight times during the case, including numerous hospitalizations. She told Department staff that her stepfather had dragged her on the street and hit her with a belt. She told Wilridge that she does not love her father, and she has stated that she wants to be placed with maternal grandmother.

Mitch testified that he could not work due to a court order in his disability case and that he previously could not work because of his bipolar disorder and ADHD. He also testified that he had not been able to find employment because of his disability and his felony conviction. Mitch testified that he had been incarcerated for two years for family violence and aggravated assault with a deadly weapon due to an incident where Lena's sister accused Mitch of choking and hitting her.

31

According to Mitch, he had not taken medication for bipolar disorder since being released from prison. The courtesy worker testified that Mitch denied having mental health issues. The caseworker testified that Mitch gave him three different addresses during the case, and he was not aware that Mitch had maintained stable housing. The caseworker also testified that he had not received any documentation or verification of Mitch's living arrangements or address. Mitch stated that he would be willing for the Department to have conservatorship of Becky, although he would like to remain in Becky's life. Wilridge testified that the Department believed that termination of Mitch's parental rights and for the Department to be permanent managing conservator was in Becky's best interest.

Having considered the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in the child's best interest. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mitch's parental rights was in the child's best interest. We overrule Appellant's second issue.

Having overruled both of Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on March 16, 2021
Opinion Delivered April 1, 2021

Before Golemon, C.J., Horton and Johnson, JJ.